**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHEILA TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-4689 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| LOUIS DeJOY, Postmaster General of the | ) | |
| United States Postal Service; SANDRA | ) | |
| FERGUSON; and KIMBERLY FREEMAN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sheila Turner brings a four-count Second Amended Complaint [67] against

Defendants Louis DeJoy as the Postmaster General of the United States Postal Service ("USPS"),

Sandra Ferguson, and Kimberly Freeman. Specifically, Turner brings claims of (I) FLSA retaliation

under 29 U.S.C. § 215 against all defendants; (II) ADEA discrimination under 29 U.S.C. § 633a

against USPS; (III) Rehabilitation Act disparate treatment and failure to accommodate under 29

U.S.C. § 791 against USPS; and (IV) Rehabilitation Act retaliation against USPS. Defendants move

for summary judgment on all counts [76]. In response, Turner requests the Court grant summary

judgment in her favor on Count III under Federal Rule of Civil Procedure 56(f). For the following

reasons, the Court grants in part and denies in part Defendants' motion and denies Turner's request.

**BACKGROUND**

The following facts come from Defendants' Local Rule 56.1 statement of material facts [77,

84] and Turner's statement of additional facts [83, 93]. They are undisputed unless otherwise noted.

1. **Turner's Background and Injury**

Turner is 63 years old. She worked for USPS from 1985 until she retired in October 2020.

At all times relevant to this case, Turner worked as the Complaints and Inquiry Clerk in the

Consumer Affairs Division. Turner worked primarily in a cubicle, answering phones, typing letters, and addressing headquarter cases related to customer satisfaction. All agree that she performed her job well, receiving favorable evaluations from her supervisors. Turner had at least three supervisors during her time in the Consumer Affairs Division. Sandra Ferguson became Turner's supervisor in 2016. Kimberly Freeman became Turner's attendance control supervisor in 2019. And Regina Aikens, who was the marketing manager, was Turner's second-level supervisor.

Turner suffered a worked-related injury on October 25, 2012—specifically, right hand and wrist tenosynovitis, left lateral epicondylitis, and bilateral carpal tunnel syndrome. It caused her to become a limited duty employee through the Office of Workers' Compensation Programs ("OWCP"). Beginning in August 2013, Turner began voluntarily updating USPS on her condition and restrictions through reports from her doctors. Turner's work restrictions included that she could not (1) perform repetitive work with both hands, (2) lift greater than five pounds, (3) push and pull (unspecified amounts of weight), or (4) use either hand for forceful grasping. She also required a ten-minute break every hour.

### 2. Accommodations and Overtime

USPS knew about at least the five-pound lifting restriction when Turner returned to work in September 2013. Turner requested an accommodation in February 2014. She sought to use Dragon dictation software to minimize her typing. Ferguson worked with IT to install the software on Turner's computer in March 2016. Turner experienced technical problems with the software. The parties dispute whether the software was effective. According to Defendants, the software worked for Turner's purposes. According to Turner, the software was so slow and ineffectual that it was unusable. The parties agree IT was called to service the software.

In 2018, Freeman canvassed USPS employees for overtime opportunities on the Cardis Collins post office plant floor, and Turner was added to the list of interested employees. Although

2

the overtime was ostensibly for employees to "report to the [non-machinable parcels ("NMO")] belt (wherever help is needed)," Turner contends that, in practice, employees would start at the NMO belt and then be assigned different tasks on the plant floor. The NMO belt is for oversized nonmachinable parcels that do not fit into standard mail processing machinery.

The parties have different conceptions of the requirements for working the NMO belt. According to Defendants, the requirements are provided in job postings. They include: physically strenuous and repetitive tasks, lifting up to 70 pounds, picking up various oversized parcels, and twisting and bending to place oversized parcels in the appropriate bins. According to Turner, the job requires additional tasks. The employees at the NMO belt helped each other out and took different roles, such that not all employees needed to lift heavy packages. The plant floor supervisor told Turner's supervisors that one of the tasks was removing small packages from the NMO belt and placing them into an "APC"[1] for processing. And at times the mail processing clerks were so overburdened that they needed as many employees to help with as many tasks as possible.

Indeed, plant floor supervisors acknowledged that there were needs for various kinds of work on the plant floor. Turner says that she was performing those jobs within her restrictions for months, and that her plant floor supervisors praised her work even though they were aware of her restrictions. The parties agree that Turner worked overtime consistently on the plant floor from 2018 to April 30, 2019, working nearly every shift offered to her. Turner worked the NMO Belt, the flat sorter sweep, the "Wall" and "DBCS machine," coaching others, and keeping the area cleaned for safety. Moreover, Ferguson and Freeman both approved Turner for overtime work on the plant floor in 2018 and early 2019. Turner says that she enjoyed the overtime work and earned substantial income through her work on the plant floor.

---

[1] The Court has been unable to discern some of the meanings behind acronyms and terms of art used for machines on the plant floor, such as "APC," the "Wall," and "DBCS," but the specific names of these machines is not material to this decision.

3

### 3. HR Training and the End of Turner's Overtime

Ferguson and Freeman attended Health and Resource Management/Injury Compensation Trainings ("HRM Training") on April 24 and April 25, 2019, respectively. The HRM Training taught procedures related to limited-duty employee restrictions and USPS protocols. Also on April 25, 2019, Turner submitted her regular activity status report, as she had done in the past, that listed the same restrictions as she had previously listed. Freeman and Ferguson reviewed her report, at least according to them, from a new perspective. Freeman consulted other Consumer Affairs clerks about the overtime work on the plant floor. Freeman also consulted OWCP about the same thing, although the parties dispute the content of these conversations based on various employees' diverging deposition testimony.

Turner's supervisors then made the decision that her overtime work was incompatible with her restrictions. Freeman told Turner in a face-to-face meeting that she was no longer permitted to work overtime on the plant floor. Turner protested the decision to several supervisors, noting that she was able to work within her restrictions and had been doing so for quite some time. Turner told her supervisors that the kind of work she did on the plant floor was not "repetitive" under her restrictions, contrasting her floor work with the difficulty of typing. Freeman did not know whether her own interpretation of "repetitive" work was consistent with the doctor's meaning, and she chose not to find out. Freeman and Ferguson did not investigate the restrictions any further.

On May 2, 2019, the Manager of Distribution Operations, Steven Johnson, told Turner that it was her managers, and not plant floor supervisors, who determined she was working outside her restrictions. On May 2 and 8, 2019, two plant floor supervisors, Michele Myles and Darian Jeter, sent Turner's Consumer Affairs supervisors emails identifying overtime work on the plant floor that Turner could perform within her restrictions. They identified, for example, that Turner could "assign/scan dispatch placard onto the rolling equipment," remove small packages from the NMO

belt, label and put trays in "DBCS racks," sweep small amounts of mail from machine bins, and label "APCs" with placards. Myles and Jeter are not clear on when they learned of Turner's restrictions. Aikens responded to these emails by claiming that the tasks were repetitive in nature, and thus not appropriate given Turner's restrictions.

Ferguson responded to Jeter with sharper words:

> Thank you for your insight in attempts to intervene on my employee's behalf and repudiate my final decision. However, as a manager it is my responsibility to protect the employee as well as the [USPS]. The Postal Service Rules and Regulations along with employees' written restrictions dictate their duty status. This is not based upon tasked duties but full functionality of a job requirement, i.e. duties/responsibilities of a mail processing clerk. I am committed to ensuring that I am within the realm of my responsibility and will not negate that due to workload. I will also respect my counterparts [sic] decision and never under mind [sic] that decision by including the employee on an email string that should be kept between EAS employees with and during any conversation we have.

On May 8, 2019, Turner provided an update from her doctor, who noted she was "OK to work overtime," though her doctor did not change any of her restrictions. Despite this note, Turner did not work overtime on the plant floor at any point after April 30, 2019. She did, however, remain on the "overtime desired list" and worked overtime in her unit when it was available.

### 4. Union Grievances

Turner's union filed four grievances on her behalf. Grievances have numerous "steps." Relevant here, at step two, the "Labor" group generally informs management. Turner objected to the underlying issues in the first three grievances in a face-to-face meeting with Freeman and Aikens. The grievances and underlying incidents were resolved as follows:

- **Grievance 582**: Freeman marked Turner absent without leave on January 28, 2019, and January 29, 2019. Turner challenged Freeman's designation, arguing that she properly turned in paperwork for a planned absence. Moreover, Turner says that Freeman told her in February 2019 that she "will not pay for 16 Hours AWOL, to grieve it," and that neither "Ms. Aikens, HR Dept., Labor, EEO office, nor anyone could make me pay you!" Labor sent a request for information about this grievance to Ferguson and Aikens on March 21, 2019. This grievance settled at Step 2 for 16 hours of annual leave on May 22, 2019.

5

- **Grievance 590**: Turner worked overtime on the plant floor on the morning of January 30, 2019, before her regular shift as a claims and inquiry clerk. Freeman denied the overtime hours, citing Turner's alleged AWOL status on the prior two days. Labor sent a request for information about this grievance to Ferguson and Aikens on February 28, 2019. The grievance settled at Step 2 for 3.76 hours of overtime worked on May 22, 2019.

- **Grievance 593**: Turner left work early on February 1, 2019, after becoming ill. Turner's sick leave was denied because, according to the reviewer, it was unscheduled. Freeman was made aware of grievance 593 on March 15, 2019. It settled at Step 2 on April 16, 2019, for 5.5 hours of scheduled sick leave.

- **Grievance 328**: Turner submitted grievance 328 based on her discontinuation of overtime on the plant floor. The grievance was settled on October 22, 2021, for $10,200.00.

Freeman acknowledged that she learned about several of these grievance settlements from Turner. In the process of responding to grievance information requests, Ferguson wrote to Freeman that "[w]e are going strict on [Turner's] restrictions." After the settlements, Ferguson (on behalf of herself and Freeman) wrote the following message to her manager, protesting the grievance process:

> After speaking with Ms. Wilson, Labor Relations Representative, regarding the three settled grievances, we wanted to discuss the reasons why they were settled in Step 2. The union bypassed the managers and did not contact anyone for a Step 1 process. There were a total of three grievances settled. There was no input requested from the management regarding the settlement.

**5. Age-Related Comments**

According to Turner, Freeman and Ferguson asked more than once whether Turner was thinking of retirement, and Freeman once suggested that Turner retire and spend more time with her family. Turner also says Freeman called her "old school." Freeman and Ferguson, however, deny these statements. Jacqueline Green, a complaints and inquiry clerk born in 1968 with the same supervisor as Turner, had restrictions and worked overtime. Green never asked for accommodations, although she could not stand for more than two hours at a time.

At least two other Complaints and Inquires Clerks who worked overtime on the plant floor were more than ten years younger than Turner. None of them asked for disability accommodations or initiated grievances.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1304 (7th Cir. 2022).

"After giving notice and a reasonable time to respond," Fed. R. Civ. P. 56(f)(1), "courts may grant summary judgment for the non-moving party if all the requirements for a judgment are met .... But ... no authority *requires* courts to do so." *Tatum v. Lucas*, No. 22-1069, 2022 WL 16844705, at *2 n.2 (7th Cir. Nov. 10, 2022) (emphasis in original), *cert. denied*, 143 S. Ct. 2619, 216 L. Ed. 2d 1214 (2023), *reh'g denied*, 144 S. Ct. 50, 216 L. Ed. 2d 1304 (2023).

## DISCUSSION

### 1. Age Discrimination (Count II)

Under 29 U.S.C. § 633a, federal government employers may not discriminate against their employees based on age. Courts assessing employment discrimination claims must determine "whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's" protected characteristic "caused the … adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *David v. Bd. of Trustees of Comm. College Dist. No. 508*, 846 F.3d 216, 224

(7th Cir. 2017). The Supreme Court has clarified that the provision applicable to federal employees, 29 U.S.C. § 633a, applies a more relaxed standard. *See Babb v. Wilkie*, 589 U.S. 399, 402, 140 S. Ct. 1168, 1171, 206 L. Ed. 2d 432 (2020) ("The plain meaning of the critical statutory language ('made free from any discrimination based on age') demands that personnel actions be untainted by any consideration of age.").

Generally, a plaintiff can defend against summary judgment on ADEA claims in two ways. *Rogers v. Chicago Bd. of Educ.*, 261 F. Supp. 3d 880, 887–88 (N.D. Ill. 2017) (Gettleman, J.). First, under the "direct method," "plaintiff can point to sufficient evidence in the record, whether called direct, indirect or circumstantial, from which a reasonable jury could conclude that defendant [took adverse action] because of her race or national origin, age, or disability." *Id.* at 887 (citing *Ortiz*, 834 at 764). Second, under the "indirect method," a plaintiff can choose to defend using the familiar *McDonnell Douglas* framework. *Id.* at 888 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

The indirect method "allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). If the plaintiff can establish a *prima facie* case, the burden shifts, and the employer must show a "legitimate, non-discriminatory reason for the adverse action." *Id.* (citing *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998)). If the employer meets its burden, the burden finally shifts back to the plaintiff, who must "prove that the employer's stated reason is mere pretext." *Id.* (citing *Sitar*, 344 F.3d at 728).

Turner opted to defend her claim under the "indirect method." (*See* Dkt. 85 at 20.) Therefore, the Court will analyze the case under that standard, mindful that it must still "assess the evidence as a whole" under *Ortiz* to determine if a reasonable jury could find Turner suffered an adverse action because of her age. *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (internal quotation marks omitted).

USPS seems to suggest that its denial of Turner's overtime may not be an "adverse action." (*See* Dkt. 78 at 13.) It is true that denial of overtime is not always an adverse employment action. *See Lewis v. City of Chicago*, 496 F.3d 645, 653–54 (7th Cir. 2007). But it can be. *See Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 729 (7th Cir. 2020) (denial of overtime pay that is consistent and significant can constitute adverse action). Defendants merely report that this issue is an "open question," while treating the denial of overtime as an adverse action in their briefs. In any event, the Court finds that USPS's denial of Turner's overtime was an adverse action in this case, as she was working overtime consistently over an extended period and earned a significant portion of her income doing so.

Nonetheless, USPS also argues that Turner has failed to prove she was treated less favorably than similarly situated employees. The Court agrees. Turner points to only two possible comparators, Ayesha Al-Hassan and Jazmine Montgomery. Although both employees were more than 10 years younger than Turner and had similar jobs and the same supervisors, neither had any medical restrictions on the physical work they could perform. That variable is key here, as it differentiates the roles that the employees were able to perform on the plant floor. In other words, it explains Turner's differential treatment in a way that has nothing to do with age. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (explaining that the similarly situated prong is used to "eliminate other possible explanatory variables, 'such as differing roles … which helps isolate the critical independent variable'—discriminatory animus.") (citation omitted).

Nor could any other evidence in the record support a finding of age discrimination. Aside from flawed comparators, Turner points only to a few inquiries, made months apart, about whether Turner was "thinking about retiring," and one suggestion that she retire to spend time with family. Although "repeated references to retirement may permit a jury to infer discrimination," *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997), "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992).

Even accepting Turner's word over Freeman and Ferguson's, as the Court must at this stage, the supervisors' comments about retirement do not amount to discrimination. First, the few inquiries that Turner says her supervisors made are just that—inquiries. Without anything more, these questions only amount to supervisors addressing their "legitimate interest in learning" Turner's plans. *Id.* Second, a single remark that Turner should retire to spend more time with family, without more, does not create an inference of age-based discrimination. *See Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 715 (7th Cir. 1999) (holding that single comment suggesting plaintiff retire in light of reduction in force, "standing by itself, does not create an inference of age-based discrimination") (citations omitted). Finally, Turner cannot provide any context to the term "old school," and has failed to connect it to any employment decision. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) ("isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus").

The Court therefore grants Defendants' motion for summary judgment as to Count II and dismisses Turner's ADEA claim.

## 2. Rehabilitation Act (Count III)

The Rehabilitation Act, 29 U.S.C. § 794(a), prohibits discrimination against qualified individuals with disabilities "solely by reason of" their disability in any programs receiving federal

funding. Courts can apply Americans with Disabilities Act precedents to analyze Rehabilitation Act claims. *See Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008). Plaintiffs may bring two forms of claims under the Rehabilitation Act, as Turner does here; claims for disparate treatment and for failure to accommodate. *See Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). Although certain portions of those claims will overlap, such as whether the plaintiff is a "qualified individual," the Court will analyze each separately.

### a. Discrimination against a Qualified Individual

To prevail on her disability discrimination claim, Turner must establish: "(1) she is disabled within the meaning of the statute; (2) that she was otherwise qualified for the job in question; (3) that she was discharged or the subject of other adverse action solely because of her disability; and (4) the employment program of which her job was a part received federal financial assistance." *Felix v. Wisconsin Dep't of Transportation*, 828 F.3d 560, 568 (7th Cir. 2016) (citations omitted). The parties agree that Turner is a person with a disability under the Rehabilitation Act. There is no dispute that USPS receives federal funding. And for the reasons described above, the Court finds that USPS's denial of Tuner's overtime was an adverse action in this case. Therefore, the only issue at this stage is whether Turner was qualified to perform the essential functions of the job.

Although courts must give "consideration … to the employer's judgment as to what functions of a job are essential," that consideration is not absolute. *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019) (citing 42 U.S.C. § 12111(8)), *as amended* (Aug. 9, 2019). The central determination is "whether removing [a so-called essential] function would fundamentally alter that position." *Id.* (citing 29 C.F.R. § 1630.2(n)(1)). Courts thus consider "[t]he consequences of not requiring the incumbent to perform the function," as well as "written job descriptions, the amount of time spend on the function, and the experience of those who previously or currently hold the position." *Id.* (citations omitted).

The parties have two different plausible conceptions of the facts, which is a good indication that the claim must be tried. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("Where the parties present two vastly different stories . . . it is almost certain that there are genuine issues of material fact in dispute."). Defendants contend that the job description identifying heavy-lifting (up to 70 pounds) and strenuous physical labor on the NMO belt is strong evidence that those tasks are essential to work on the plant floor. They also cite Freeman and Ferguson's judgment that heavy and repetitive lifting was essential to the job. Turner, on the other hand, contends that the plant floor job description does not match the reality of the work on the plant floor. Instead, there were a wide variety of tasks that did not involve heavy lifting but that nonetheless were necessary to the plant floor. Turner's plant floor supervisors agreed, pointing to a long list of tasks that Turner performed within her limitations successfully for months or more. After the plant floor's general workload became untenable, the team needed all the help it could get performing a variety of tasks.

A reasonable jury could agree with either side. Turner appears to have been performing work on the plant floor successfully for months without any heavy lifting. Turner's plant floor supervisors agreed she could do the work. And the facts suggest that *only* Freeman and Ferguson, neither of whom supervised the plant floor, had an issue with employees splitting up tasks "according to their capacities and abilities." *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 198–99 (7th Cir. 2011). Alternatively, some evidence supports USPS's view that working on the NMO Belt required the exact kind of tasks Turner's disability prevented her from performing. In short, a jury must determine what work was essential to the overtime role Turner filled. The Court therefore denies Defendants' motion for summary judgment and Turner's Rule 56(f) request as to Turner's disability disparate treatment claim.

### b. Failure to Accommodate

To succeed on a failure to accommodate claim under the Rehabilitation Act, Turner must prove (1) she is a qualified individual with a disability, (2) USPS knew about her disability, and (3) USPS nonetheless failed to reasonably accommodate that disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). Turner challenges USPS's failure to accommodate her work both on the plant floor and through dictation software to assist her typing.

### i. Plant Floor

Although Defendants correctly point out that the record is somewhat unclear on when plant floor supervisors knew about Turner's disability, it is undisputed that Freeman and Ferguson knew about Turner's disability. Moreover, viewed in the light most favorable to Turner, the evidence suggests that her plant floor supervisors knew about Turner's disability at times relevant to their determination of functions essential to her position. The determination of USPS's potential failure to accommodate Turner, therefore, turns largely on the "essential functions" of Turner's role. If those functions included heavy and repetitive lifting on the NMO belt, Defendants may be right that no accommodation would have been reasonable. If such functions were marginal, Turner may be right either that no accommodation was required or that only a minor accommodation would have sufficed. The Court therefore denies Defendants' motion for summary judgment and Turner's Rule 56(f) request as to Turner's plant floor failure-to-accommodate claim.

### ii. Dictation Software

Turner argues that "Ferguson made no attempt to find alternate software after Turner informed her that the [Dragon dictation] software wasn't working." (Dkt. 85 at 12.) But it is not clear that Turner ever *asked* for different software, nor would USPS necessarily be required to provide it. *See Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008) (explaining that "[a]n employer is not obligated to provide an employee with the accommodation [s]he requests or prefers,

13

the employer need only provide some reasonable accommodation") (citations omitted). Indeed, the Dragon dictation software was the exact software Turner had requested, and after providing it, IT confirmed that the software was working. Although Turner complained that the software was slow and ineffectual, she does not show how USPS could have reasonably changed that. USPS provided exactly what Turner requested and serviced the software when Turner complained it did not work. The Court therefore grants Defendants' motion for summary judgment as to Turner's dictation software failure-to-accommodate claim.

### 3. Retaliation

Both the Rehabilitation Act and the FLSA prohibit retaliation against employees who engage in statutorily protected activities. *See Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023) (Rehabilitation Act); 29 U.S.C. § 215(a)(3) (FLSA). Under both statutes, Turner must establish that (1) she engaged in a protected activity, (2) her employer took an adverse employment action against her, and (3) the first two elements are causally linked. *See Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018). Turner may prove her case using the "direct" or "indirect" methods described above. *See Lewis v. McDonald*, No. 16-CV-1092-PP, 2018 WL 1135555, at *10 (E.D. Wis. Feb. 28, 2018) (Pepper, J.), *aff'd sub nom. Wilkie*, 909 F.3d 858. Either way, the Court must "analyze the evidence as a whole to determine 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the ... adverse employment action.'" *Wilkie*, 909 F.3d at 871 (citing *Ortiz*, 834 F.3d at 765).

Defendants in effect concede, at least for the purposes of their motion, that Turner engaged in protected activity by requesting accommodations and filing grievances related to her overtime wages. They also concede that discontinuation of Turner's overtime on the plant floor constituted an adverse action. Therefore causation is the only issue. Turner may show causation under the direct method through direct evidence or "circumstantial evidence that is relevant and probative on

14

any of the elements of a direct case of retaliation." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012) (citing *Treadwell v. Office of Ill. Sec. of State*, 455 F.3d 778, 781 (7th Cir. 2006)). Retaliation may be inferred from various forms of circumstantial evidence, including: "(1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Id.* at 973. "Ordinarily, the persuasiveness of an employer's non-retaliatory explanation . . . is for the finder of fact to assess." *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 431 (7th Cir. 2018) (quotation marks and citations omitted).

### a. FLSA Retaliation (Count I)

Turner presents evidence that USPS was hostile toward her overtime grievance and that USPS's decision to cut her overtime was suspiciously timed relative to her grievance. There is no "bright-line rule" to determine "suspicious timing" in retaliation cases, but "where there is corroborating evidence of retaliatory motive, an interval of a few weeks or even months may provide probative evidence of the required causal nexus." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) (internal quotation marks omitted); *see also Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (whether timing is suspicious "depends on context"). At least Ferguson became aware of Turner's overtime grievance around February 28, 2019, when Labor sent Ferguson and Aikens a request for information. Just two months later, Ferguson, Aikens, and Freeman discontinued Turner's overtime.

This two-month gap is made more suspicious by corroborating evidence. For example, Ferguson complained to her manager about her perceived lack of input on Turner's overtime grievance. Although Defendants correctly point out that Ferguson's email was sent after Turner's overtime grievance settled in May 2019, they fail to consider that this after-the-fact email is evidence of Ferguson's opinion during the grievance process. Freeman was similarly frustrated with the

process. She told Turner that "Ms. Aikens, HR Dept., Labor, EEO office, nor anyone could make me pay you!" A reasonable jury could find that Ferguson and Freeman's decision to discontinue Turner's overtime was caused by Turner grieving the denial of her overtime pay.

Defendants argue that USPS had a valid, non-retaliatory reason for discontinuing Turner's overtime; that is, that Freeman and Ferguson learned new information in the HRM Training and realized that Turner could not work overtime on the plant floor given her medical restrictions. But there is ample evidence in the record suggesting that Freeman and Ferguson's reasons were pretextual. "Pretext can be shown by 'identif[ying] … weaknesses, implausibilities, inconsistencies, or contradictions' in an employer's asserted reason for taking an adverse employment action such 'that a reasonable person could find [it] unworthy of credence.'" *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) (quoting *Donahoe*, 667 F.3d at 852–53). Here, Freeman and Ferguson knew of Turner's restrictions and knew she was nonetheless working on the plant floor successfully for months. Moreover, the plant floor supervisors themselves noted that Turner was able to perform the work required of her on the floor within her limitations. Finally, during the grievance process, Ferguson wrote Freeman that they would be "going strict on [Turner's medical] restrictions" and asking her to "[p]lease check with Labor if there is a regulation prohibiting overtime when it deals with restrictions." A reasonable jury could view those messages as evidence of pretextual reasons for discontinuing Turner's overtime.

The Court therefore denies Defendants' motion for summary judgment as to Count I.

### b. Rehabilitation Act Retaliation (Count IV)

Turner's Rehabilitation Act retaliation claim has a timing problem. Although Turner "does not need to show but-for causation," she must show "that retaliatory intent played a part in her termination." *Fuller*, 84 F.4th at 691 (citing *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022)). Turner claims that USPS retaliated against her for requesting plant floor accommodations by

discontinuing her overtime on the plant floor.[2]  But Turner's plant floor overtime was discontinued on April 30, 2019.  There is no evidence in the record that Turner asked for plant floor accommodations before that date.  Indeed, after Turner learned of the initial decision to cut off her plant floor overtime, she protested that she could work on the plant floor *within her restrictions*—or, put differently, without accommodation.  It was not until early-May that Turner's doctor and plant floor supervisors began to advocate for reasonable accommodations on Turner's behalf.  Although there may have been problems with that process, as discussed above, Turner cannot prove that an accommodation request made after an adverse action caused that adverse action.  The Court therefore grants Defendants' motion for summary judgment as to Count IV and dismisses the claim.

**CONCLUSION**

For these reasons, the Court grants in part and denies in part Defendants' motion for summary judgment [76] and denies Turner's Rule 56(f) request.  The Court denies Defendants' motion as to Counts I and III, except on that narrow "dictation software" accommodation claim. The Court dismisses Turner's claim that USPS unlawfully "denied Plaintiff's request for a reasonable accommodation in the form of usable dictation software."  (Dkt. 67 ¶ 51.).  The Court grants Defendants' motion as to Counts II and IV and dismisses both claims.

**IT IS SO ORDERED.**

Date: 4/5/2024

Entered:

SHARON JOHNSON COLEMAN
United States District Judge

---

[2] In their opening brief, Defendants argue that they are entitled to summary judgment on Turner's Rehabilitation Act retaliation claims no matter the underlying request for accommodation.  In response, Turner fails to address retaliation based on her request for dictation software.  She thus waives the argument. In any event, the Court agrees there is no evidence that USPS retaliated against Turner for requesting dictation software five years after she made that request.  The Court therefore grants Defendants' motion to the extent it addresses a retaliation claim for failure to accommodate through dictation software.